```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
```

UNITED STATES OF AMERICA,

    -against-

JULIO LORENZO,

                  Defendant.

**REPORT AND RECOMMENDATION**

05-CR-0849 (SJ) (KAM)

```
----------------------------------------X
```
MATSUMOTO, United States Magistrate Judge:

      This matter was referred to the undersigned, pursuant to 28 U.S.C. § 636(b), by the Honorable Sterling Johnson, Jr., on May 19, 2006, for preparation of a report and recommendation on defendant Julio Lorenzo's motion to suppress. Defendant is charged in a four-count superseding indictment (Docket No. 32), filed on January 20, 2006, with conspiracy to import and importation into the United States from a place outside thereof, five hundred grams or more of a substance containing cocaine, in violation of 21 U.S.C. § 952 (a), and conspiracy to possess and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

      Presently before the Court is defendant's motion to suppress post-arrest statements on the grounds that they were obtained in violation of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). (<u>See generally</u>, Doc. No. 58, Affidavit of Julio Lorenzo dated May 4, 2006 ("Lorenzo Aff.").) For the following reasons, it is respectfully recommended the defendant's motion to

suppress be denied.

## I. FINDINGS OF FACT

On July 19, 2006, this Court conducted an evidentiary hearing on defendant's motions to suppress. At the hearing, the Court heard testimony from United States Immigration and Customs Enforcement ("ICE") Special Agents Michael Kim ("Special Agent Kim") and Thomas Halvas ("Special Agent Halvas"). Defendant did not testify. Having considered the appropriate burdens of production and proof, the testimony of Special Agents Kim and Halvas, the suppression hearing exhibits, the parties' written submissions, including defendant Lorenzo's affidavit dated May 4, 2006, and having resolved issues of credibility, the Court finds the following essential facts. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record"); see also United States v. Miller, 382 F. Supp. 2d 350, 361-363 (N.D.N.Y. 2005) (summarizing burdens of production and proof).

In or around the late evening of October 13 and early morning of October 14, 2006, ICE agents, along with a cooperating co-defendant in this matter, made a controlled delivery to defendant's residence at 34-09 103rd Street in Queens, New York. (See Transcript of Proceedings held on July 19, 2006 ("Tr."), at 5.) While inside the defendant's apartment, ICE agents

encountered a "little girl" in one of the rooms. (Tr. 6.)
Agents asked the girl whether there was anyone else in the
apartment, and she answered that her father was in the next room.
(Tr. 7.) Agents knocked on the door of defendant's room and
asked that he come out. (Id.) Defendant complied (id.) and
appeared to have been asleep (Tr. 9). After agents interviewed
defendant as well as the other residents of that apartment to
obtain pedigree information, they arrested two other individuals
and left. At that point, defendant was not placed under arrest,
and remained in the apartment.

Upon realizing that they had arrested the wrong
individual, approximately one hour following their first visit to
defendant's residence, ICE agents returned to the 34-09 103rd
Street address, where they again encountered defendant. (Tr. 9.)
Special Agent Kim testified that defendant was subsequently
arrested and transported to the ICE office at John F. Kennedy
International Airport, Narcotics Smuggling Unit ("JNSU"), in
Queens, New York. (Tr. 10.)

The agents who testified at the evidentiary hearing on
July 19, 2006 did not testify regarding the circumstances of
defendant's arrest or transport to JNSU (Tr. 20). Special Agent
Kim testified that upon arrival at JNSU in the early morning
hours of October 14, 2005, defendant was placed in a holding pen.
(Tr. 10.) According to Special Agent Kim, at that point, a "few

hours" had passed since ICE agents first awoke defendant during their first visit to his residence. (Tr. 10-11.) Special Agent Kim testified that he observed defendant in the holding pen, that defendant was not asleep and that defendant did not appear to be "disoriented" (Tr. 11, 20). Although he might have looked "upset[,]" defendant was not crying. (Tr. 21.) Special Agent Kim did not recall whether defendant was provided anything to eat or drink while in the holding pen. (Tr. 20.)

Within a "few minutes after his arrival" at JNSU, defendant was taken to an interview room[1] (Tr. 21), where he was interviewed by Special Agents Kim and Halvas. (Tr. 11, 48.) Special Agent Halvas did not recall if anyone else was presented in that interview room. (Tr. 55.) Although Special Agent Kim did not specifically recall whether defendant was in handcuffs while in the interview room, he testified that arrestees are typically handcuffed while in the interview room for safety reasons. (Tr. 11.) Special Agent Halvas testified that at the outset of the interview, defendant was not asleep, and did not appear "groggy" or confused." (Tr. 48-49.)

Special Agent Kim credibly testified that while in the interview room, and prior to interviewing defendant, he read defendant his <u>Miranda</u> rights in Spanish and in the presence of

---

[1] Special Agent Halvas testified that the interview took place around 4:45 a.m. (Tr. 48.)

Special Agent Halvas. (Tr. 12-15, 49.)  Special Agent Kim read defendant his rights in Spanish, "line by line[,]" from the Spanish language Miranda warnings card that he kept in his wallet.  (Tr. 12-13; Gov't Ex. 1, at 2, Spanish language warnings card.)  Specifically, Special Agent Kim testified that he advised defendant of his right to remain silent, that anything he told the officers could be used against him in court, that he had the right to an attorney and that if he could not afford an attorney for purposes of the interview and future proceedings, one would be appointed for him.  (Tr. 13-15.)  Special Agent Kim further testified that at the end of each warning, he stopped to ask defendant whether he understood the right.  (Id.)  Following each warning, defendant acknowledged that he understood each right.  (Id.)  Special Agent Halvas confirmed that Special Agent Kim read defendant his Miranda warnings in Spanish.  (Tr. 49.)  When questioned why defendant was not asked to sign a form indicating that he was advised of his Miranda rights, Special Agents Kim and Halvas both responded that their office had run out of such forms.  (Tr. 24, 56.)  Based on the foregoing, the Court finds that defendant was advised of and understood his Miranda rights.

Contrary to defendant's assertion in his affidavit that he felt "groggy" and "disoriented" at the time he made statements to the agents (Lorenzo Aff. ¶ 4), Special Agents Kim and Halvas testified that defendant did not appear groggy, confused, or

disoriented (Tr. 15, 48).  Special Agent Kim also testified that defendant did not fall asleep at any point during the interview. (Tr. 15.)

After being read his Miranda rights by Special Agent Kim, and after defendant acknowledged that he understood those rights, the agents explained the charges against defendant and the purpose of their questioning him.  (Tr. 22, 50.)  Through Special Agent Kim, who spoke Spanish, Special Agent Halvas advised defendant that he was involved in a narcotics case where drugs had been seized.  (Tr. 57.)  While Special Agent Halvas was not sure whether he had advised defendant of the quantity of drugs seized, defendant was told that he "could receive a possible sentence of maybe up to ten years in jail. . . ."  (Id.; see also Lorenzo Aff. ¶ 5 ("The agents told me that I . . . may be facing ten years in jail").)  The agents also communicated to defendant their desire to ascertain the names of other individuals who were involved in the drug importation scheme, and explained that any cooperation by defendant would be "noted and turned over to the AUSA's office[,]" and that cooperation could lead to the possibility of a reduced jail sentence.  (Tr. 58-59.) The Special Agents testified that at no time during the course of the interview were any threats made towards defendant.  (Tr. 15, 50.)

Having been advised of his Miranda rights, defendant

nevertheless responded to the agents' questions. (Tr. 50.)
Special Agent Halvas testified that when asking questions, he and
Special Agent Kim used a "normal" tone of voice, did not push or
shove defendant and did not stand up or bang around any objects
in the room. (Tr. 51.) The agents both testified that towards
the end of the interview, which lasted approximately 15 to 20
minutes in total (Tr. 17), the tenor of the voices changed – that
voices were raised. (Tr. 24, 52.) Special Agent Halvas
testified that defendant was the first to raise his voice and
that he appeared "agitated." (Tr. 52.) Defendant insisted that
he "doesn't deal drugs[,] and that he is "a dumb cab driver,"
doesn't know anything[,]" to which Special Agent Halvas responded
that defendant would have to "tell that to the judge." (Id.) At
that point, because the interview was not progressing, Special
Agent Halvas decided to terminate the interview, and both agents
left the room. (Id.)

## II. CONCLUSIONS OF LAW

Defendant moves to suppress his statements in the
interview room on the grounds that he does not recall being
advised of his Fifth Amendment rights prior to his interview, in
violation Miranda v. Arizona. (See generally, Lorenzo Aff.) The
government opposes defendant's motion, asserting that defendant
voluntarily made statements after he had been advised of his

-7-

Fifth Amendment rights in Spanish. (See Doc. No. 55, Gov't Memorandum of Law in Opposition to Defendant Julio Lornezo's Motion to Suppress ("Gov't MOL"), at 15-17.) Defendant had been arrested and was in custody at the time he made statements in response to questions by law enforcement agents during his interview. See California v. Beheler, 463 U.S. 1121, 1125 (1983) (defining "custody," *inter alia*, as a formal arrest). Thus, the Court must determine whether defendant was given his Miranda warnings, and whether he knowingly and voluntary waived his rights.

It is well-settled that an individual has the right not to be subjected to custodial interrogation before being informed of his rights under the Fifth Amendment, commonly referred to as the Miranda warnings. Miranda, 384 U.S. at 467-68; see also United States v. Pantane, 542 U.S. 630, 634 (2004); Dickerson v. United States, 530 U.S. 428, 444 (2000). Under Miranda, "an uncounseled statement made by an accused during custodial interrogation should be suppressed unless the government proves that the defendant voluntarily waived his right to counsel and privilege against self-incrimination." United States v. Ovalle, 02 CR. 975, 2003 WL 223588 (S.D.N.Y. Feb. 3, 2003) (citing United States v. Gaines, 295 F.3d 293 (2d Cir. 2002)). Specifically, law enforcement agents conducting a custodial interrogation are required to advise a suspect "that he has the right to remain

silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479. "Miranda warnings are intended principally to safeguard the suspect's privilege against self-incrimination." United States v. Ramirez, 79 F.3d 298, 304 (2d Cir. 1996) (citation omitted).

Once an accused is apprised of his Fifth Amendment rights, however, the accused can waive those rights. A waiver is valid if the government shows, by a preponderance of the evidence, that "(1) the relinquishment of [a defendant's] right was voluntary, and that (2) [the defendant] had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). "Whether a waiver is 'knowing and voluntary' is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." United States v. Spencer, 995 F.2d 10, 11 (2d Cir. 1993) (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)).

"[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.'" Butler, 441 U.S. at 374-75 (quoting Johnson v.

Zerbst, 304 U.S. 458, 464 (1938)).  More specifically, in
determining voluntariness, a court may consider, among other
factors, the conduct of the police, the suspect's age,
intelligence, education and language ability.  See Gordon Mehler,
John Gleeson & David C. James, Federal Criminal Practice: A
Second Circuit Handbook 95 (2005 ed.) (citations omitted).  When
evaluating voluntariness, there is no *per se* rule that bars
implicit waivers, Butler, 441 U.S. at 373, but instead, trial
courts are required to make a case-by-case determination based
upon the totality of the circumstances, Tankleff v. Senkowski,
135 F.3d 235, 244-45 (2d Cir. 1998).  See also Gaines, 295 F.3d
at 297-298.

Based on the above findings of fact, this Court
concludes that suppression of defendant's October 14, 2005
statements is unwarranted.  The government has demonstrated, by a
preponderance of the evidence, that Miranda warnings were given
to defendant.  This Court fully credits Special Agent Kim's
testimony that he read defendant his Miranda rights, line by
line, in Spanish before the questioning commenced, and that
defendant affirmatively stated that he understood each of the
rights and then agreed to talk to the agents.  Thus, the
government has met its burden of showing that defendant was
properly advised of his Miranda rights prior to being questioned
by Special Agents Kim and Halvas and giving any statement in

response thereto.

The Court also finds that defendant knowingly and voluntarily waived his Miranda rights, and understood the consequences of his waiver. There is no indication that defendant's statements were involuntary, that there was any coercion attached to any of the questions posed by Special Agents Kim and Halvas, or that defendant's will was otherwise overborne. See Haynes v. Washington, 373 U.S. 503, 513-14 (1963) (fundamental inquiry is whether the law enforcement officials have "overborne the will" of the accused); United States v. Male Juvenile, 121 F.3d 34, 41 (2d Cir. 1997) ("A voluntary relinquishment of a right occurs when the relinquishment is the 'product of a free and deliberate choice rather than intimidation, coercion, or deception.'") (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

With respect to defendant's suggestion that his voluntariness was affected by the agents' mention of a possible ten-year jail sentence, the Court finds that this statement was not an improper threat warranting suppression of defendant's statements. The United States Court of Appeals for the Second Circuit has stated that:

> we are unconvinced that the mere mention of the possible sentence facing a defendant and the benefits to be derived from cooperation converts an otherwise proper encounter between the police and the accused into a coercive and overbearing experience.

-11-

United States v. Bye, 919 F.2d 6, 9-10 (2d Cir. 1990); see also United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995) ("Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive . . . . Statements such as these are merely common sense factual observations." (internal citations omitted)); United States v. Pomares, 499 F.2d 1220, 1222 (2d Cir. 1974) ("It was quite proper . . . to mention the situation which [the defendant] faced and the advantages to him if he assisted the government"); United States v. Braxton, 112 F.3d 777, 782 (4th Cir. 1997) (finding the statement "you can do five years because you're not coming clean" not an overpowering threat); United States v. Eqipciaco, 389 F. Supp. 2d 520, 526-27 (S.D.N.Y. 2005). Instead, threats, misrepresentations or promises concerning possible jail terms factor into the "totality of the circumstances" evaluation. See Eqipciaco, 389 F. Supp. 2d at 527.

Here, in view of the totality of the circumstances, it appears that the agents merely advised defendant of the reasons for his arrest, the potential consequences of the charges against him, and the benefits of cooperation. The agents did not exaggerate defendant's possible sentence[2], nor improperly suggest

---

[2] The charge of conspiring to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), carries a maximum term of imprisonment of 40 years. See 21 U.S.C. § 841(b)(1)(B)(ii)(II).

the benefits of cooperating with the government investigation. Indeed, defendant's own affidavit is consistent with Special Agent Halvas's testimony that defendant was advised of the possibility of receiving a ten-year jail term. (Compare Tr. 57 (defendant was advised that he "*could* receive a *possible* sentence of *maybe* up to ten years in jail") with Lorenzo Aff. ¶ 5 ("The agents told me that I . . . *may* be facing ten years in jail") (emphasis added).

Defendant's allegations that he was "distressed," "scared," "confused," "groggy and disoriented," are not supported by the record. (See Lorenzo Aff. ¶¶ 4-5.) Defendant asserts that he was tired, groggy, disoriented and distressed because of being awakened by government agents and because he worked for "eight hours" the previous day. (Id. ¶ 4.) The hearing testimony, however, revealed that a "few hours" had passed between the time defendant was awakened during the agents' first visit to defendant's residence and defendant's interview at JNSU. (See Tr. 10-11.) Moreover, Special Agents Kim and Halvas testified that they did not observe defendant asleep in the holding pen at JNSU and that during their interview, defendant did not appear groggy or disoriented. (See Tr. 15, 48.) Moreover, there is no evidence in the record that defendant indicated in any manner to the agents that he was too tired to proceed with the interview.

-13-

In any event, "absent police misconduct," defendant's assertion that he was too tired, groggy, scared and disoriented (Lorenzo Aff. ¶¶ 4-5) to fully appreciate the nature of his interview with Special Agents Kim and Halvas is insufficient to support a Miranda violation. See United States v. Knorr, 04-CR-406, 2005 WL 356803, at *2 (S.D.N.Y. Feb. 14, 2005) (defendant's "allegation that he was too hung over, sick and tired to fully comprehend" his interaction with law enforcement personnel who questioned him was insufficient to make out Miranda violation absent an allegation of police misconduct) (citing United States v. Feola, 651 F. Supp. 1068, 1119 (S.D.N.Y. 1987) (finding that "confession offered under the pangs of a heroin withdrawal, in the absence of coercive police activity, is not involuntary for Miranda purposes")); see also Colorado v. Connelly, 479 U.S. 157, 167 (1986) ("We hold that coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.")). Because the record is devoid of any evidence or allegation by defendant of any misconduct by any ICE agents, the Court finds that defendant voluntarily waived his Miranda rights.

Moreover, in view of the totality of the circumstances, the fact that voices were raised during the interview does not undermine a finding that defendant waived his Miranda rights. The record reflects that defendant initially raised his voice in

an effort to communicate statements which he believed would exonerate him. There is no indication that defendant was threatened in any way into making statements, nor subjected to repeated or unduly prolonged questioning, or an otherwise coercive atmosphere. See United States v. Iovanne, 92-CR-41, 1993 WL 465392, at *13 (D. Conn. Sept. 9, 1993). Indeed, Special Agent Halvas terminated the interview when, after voices were raised, he believed the interview was not progressing. Moreover, there is no indication in the record suggesting that factors such as age, intelligence, level of education or language barriers prevented defendant from fully understanding his rights, having an awareness that his Fifth Amendment rights could and would be waived by speaking with the agents, or understanding the consequences of waiving such rights.

Accordingly, the government has sustained its burden of proving, by a preponderance of the evidence, that defendant (i) was given and understood his Miranda warnings, (ii) voluntarily waived his Fifth Amendment rights prior to questioning, and (iii) had full awareness of the rights being waived and of the consequences of waiving those rights. It is therefore respectfully recommended that the District Court deny defendant's motion to suppress.

### III. CONCLUSION

For the reasons and upon the factual findings and legal conclusions set forth above, it is respectfully recommended that defendant's motion to suppress be denied.  Any objections to this Report and Recommendation must be filed with United States District Judge Sterling Johnson, Jr. within ten days of the date of its entry.  Failure to object within ten days of the date of entry will preclude appellate review by the District Court.  See 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989).  Any requests for extensions of time to file objections should be made to Judge Johnson.

**SO ORDERED.**
Dated: August 1, 2006
       Brooklyn, New York

/s/
**Kiyo A. Matsumoto**
United States Magistrate Judge
Eastern District of New York